# Commonwealth *against* Bank of Pennsylvania.

# In Equity.

The plaintiff's bill charged, that the defendants were depositors and trustees for the plaintiff of large sums of public moneys, which they threatened to apply to their own use, and that they had misapplied and converted to their own use large portions thereof, and prayed an injunction to restrain them from paying out said trust moneys, or assigning any of their effects, on which an injunction issued after notice, and without objection. Afterwards, by consent, the defendants were allowed to pay to the use of the plaintiff the amount deposited and the current expenses of the Bank, without prejudice. The defendants, some time after, filed their answer, denying that they were trustees, and that they had received the moneys otherwise than as deposits in the usual course of business, and answering the other parts of the bill, and praying a dissolution of the injunction. An Act of Assembly was then passed to enable the defendants to make an assignment, which, in the first section, enacted that such assignment should be made, if approved by the stockholders; *provided,* the Commonwealth should have a right of voting in the election of assignees proportioned to her number of shares. The other sections prescribed the duties and powers of the assignees, and the last section declared, that before any assignment should be made, the defendants should pay the debt due to the Commonwealth. The stockholders resolved to assign, and elected assignees, but the election was held void by the Supreme Court, in consequence of the imperfections of the proviso, in relation to the number of votes the plaintiff was entitled to. *Held,* that the other parts of the Act remained in force and effect, and by them the Commonwealth was secured a priority of payment, and that the injunction ought not to be dissolved.

The equity powers of the Supreme Court are, as to individuals, circumscribed

[Commonwealth v. Bank of Pennsylvania.]

within narrow limits; but over corporations they are general and unlimited, and to be exercised in the ordinary mode of a court of chancery.

If a corporation is trustee, and the plaintiff has a priority of payment, injunction lies to restrain a misapplication of their funds.

ON the 31st January 1842, the attorney-general, on behalf of the commonwealth, filed a bill against the defendants, setting forth that "The President, Directors and Company of the Bank of Pennsylvania," being a banking corporation, the chief place of business of which is situate in the city of Philadelphia, established under and by authority of the laws of the said commonwealth, is made and constituted by said laws, the depository of the public moneys of the said commonwealth. That in pursuance of the requisitions of the laws of the said commonwealth, large sums of the said public moneys have been deposited with said banking corporation from time to time, amounting to the sum of $800,000 and upwards, which said sum now is in the custody, charge, and keeping of the said "The President, Directors and Company of the Bank of Pennsylvania," held and kept in trust to be faithfully applied and paid over by them to such purposes and uses as the laws of said commonwealth direct and prescribe. That said laws direct and prescribe, that the sum of money on deposit as aforesaid, shall be on the 1st day of February next ensuing, paid over and applied to the liquidation and discharge of the semi-annual interest due by the said commonwealth on that day, to the respective holders of the certificates of loans made to said Commonwealth under authority of its laws. But now so it is, may it please your honours, the said President, Directors and Company of the Bank of Pennsylvania, in violation of the said trust confided to them, and intending to disregard the same, refuse to comply with said requisitions of the laws of this commonwealth, to pay and apply the said sum of $800,000 and upwards, moneys of this commonwealth as aforesaid, to the uses and purposes designated by law, for which said money was received. And as the said Ovid F. Johnson charges, threaten and intend to apply the said sum of money to their own use, in utter disregard of the obligations and duty created by law, and imposed on them, the said defendants, as the depository of the public moneys as aforesaid, unless they are restrained therefrom by the immediate injunction of this honourable court.

And the said Ovid F. Johnson, attorney-general as aforesaid, further charges, that the said defendants have misapplied and converted to their own use, large portions of the public moneys deposited with them, on the trust and for the purposes above set forth, and that great loss and detriment will result to the said commonwealth of Pennsylvania, unless all the real and personal estate and all the assets of all sorts and kinds whatsoever, together with all books, notes, vouchers, and so forth, be secured under the order and direction of the court in such manner, and in the hands

[Commonwealth v. Bank of Pennsylvania.]

of such agents or officers as to the said court may seem meet. All which actings, doings, and refusals, are contrary to equity and good conscience, and tend to the manifest wrong and injury of the said commonwealth in the premises. In consideration whereof, and forasmuch as your orator in behalf of said commonwealth can only have adequate relief in a court of equity, where matters of this kind are properly cognizable and relievable, and in the mode now pursued, to the end therefore, that the said President, Directors and Company of the Bank of Pennsylvania, may, on their oaths, to the best and utmost of their knowledge, remembrance, information and belief, full, true, direct, and perfect answers make to all and singular, the matters aforesaid, and that as fully and particularly, as if the same were here repeated, and they and every of them distinctly interrogated thereto; and more especially that they the said defendants may in manner aforesaid answer and state, first, whether they the said defendants, did not receive on deposit, the sum of money aforesaid, belonging to the said commonwealth of Pennsylvania, to and for the trusts, uses, and purposes aforesaid: secondly, whether the said sum of money, or any part of it, has been misapplied and converted to the uses of the said defendants, and if so, how much. Thirdly, whether they the said defendants do not threaten and intend to refuse to pay over the said sum of money to and for the trusts and uses for which the same was received. And fourthly, whether they, the said President, Directors and Company of the Bank of Pennsyvania, are not now wholly unable and unwilling to pay to the said commonwealth, or to the purposes directed by law, the whole or any part of the said sum of money deposited in the manner aforesaid, for the uses aforesaid, and whether the said commonwealth is not in great hazard of losing the same. And that said defendants may answer the premises; and that a full and true account may be taken of every the said trust moneys, the sum received on deposit by said defendants, the sum misapplied and converted to their own use. The property of all kinds whatsoever, real, personal, and mixed, in possession of, and belonging to said defendants, and that they shall be decreed to pay the amount which seems to be due to the said commonwealth on such account. And that in the mean time, some proper persons may be appointed to take charge of such trust estate, and effects, and all the estate and effects belonging to said defendants. And that said defendants may be restrained by the order and injunction of this honourable court, from paying out any of their said trust moneys, or any other moneys, or from selling, assigning, transferring or delivering any of their real or personal estate or effects of any sort whatsoever, to or for any purpose whatsoever. And further may it please your honours, to grant unto your orator the commonwealth's writ of subpœna, &c.

Annexed was an affidavit by Job Mann, Esq., that he is the

State Treasurer of the Commonwealth of Pennsylvania, duly elected according to law. That public moneys to the amount of $800,000 and upwards, belonging to the commonwealth, have been deposited in pursuance of law, in the Bank of Pennsylvania, (and its branches). That said public moneys were to be, and ought to be forthcoming to pay the semi-annual interest on the public debt falling due on the 1st day of February, to wit, to-morrow. That said deposit was made on this trust and for this use in said bank. That this deponent has reason to believe and does believe that said President, Directors and Company of the Bank of Pennsylvania do not intend to pay and apply said money thus deposited to the uses for which said deposit was made, but that they do intend, and unless restrained therefrom by the order of this court, will convert the same to their own use or to other uses in violation of law.

An injunction was thereupon issued, (not being objected to by the defendants), reciting the allegations of the bill, and enjoining the defendants from paying out any of the trust moneys aforesaid, or other moneys, or from selling, assigning, transferring or delivering any of their real or personal estate or effects whatsoever to or for any purpose whatsoever, until the hearing of this cause by the court.

On the 14th of February following, it was, on motion of the attorney-general, ordered that the injunction in the above case be so far modified that the defendants shall be at liberty to pay to the treasurer of the commonwealth the amount deposited with them by the commonwealth; and also the current expenses of the bank.

The above order was made without prejudice to the rights of either party.

On the 17th of February, an answer was affirmed to and filed, setting forth that " the Bank of Pennsylvania is a banking institution, duly incorporated and established by the laws of the Commonwealth of Pennsylvania, under the corporate name of the President, Directors, and Company of the Bank of Pennsylvania; and that the chief place of business of said bank, is in the city of Philadelphia.

That various sums of money of said commonwealth, have been from time to time, remitted to, and deposited with said defendants, and that the sums of money so remitted to and deposited with the said defendants by the said commonwealth, amount to the sum of $782,819.56, the whole of which was received by said defendants in notes and checks on other banks, and more than one-half thereof, in notes of, and checks on the Girard Bank, in the city of Philadelphia; that they have endeavoured to dispose of as large a portion of their Girard Bank funds, as was in their power, and that there is still due to them, the sum of $80,000 and upwards, from the said bank.

[Commonwealth v. Bank of Pennsylvania.]

And further that they received the said moneys of the said commonwealth to the amount aforesaid in the usual course of their business, in the same manner, upon the same terms, and under the same obligations, as they have received the moneys of all other depositors, during the whole time of their existence as a banking corporation, and upon no other terms, conditions, or obligations whatsoever.

That the usual course of the business of the said bank has been, at all times, to use the deposits made in said bank, in the discount of notes, the payment of checks, or for any other purpose, which the necessities or convenience of the said bank might require, and to pay such deposits at all times on demand.

That this mode of using the deposits made with said bank, was or ought to have been known, and understood by the depositors, and particularly to the agents of the commonwealth, who deposited the said public moneys with defendants, with the knowledge that said bank would use said funds, as some compensation for the trouble and expense of disbursing the same in the payment of the interest due by the commonwealth to the holders of certificates of loans made to said commonwealth. That for this purpose they employed a clerk, with a salary, purchased books, and incurred other expenses, for which they were to receive no remuneration or compensation from the commonwealth, except the privilege they enjoyed of using the said funds as aforesaid.

And these defendants further answering, deny that they have, in violation of the trust confided to them, refused to comply with the laws of this commonwealth, or refused to pay any sum or sums of money due by the said defendants to the said commonwealth or to any person or persons whomsoever, until they were enjoined from so doing, by this honourable court.

That they have kept a general account with the Commonwealth of Pennsylvania, as with their other depositors, and that they have never paid the interest due on the loans made to the commonwealth or other debts or orders of the commonwealth, except when a draft has been regularly made on them for that purpose, and that no order or draft has been received by them, for the balance due by them to the commonwealth.

And these defendants further answering say: that they have received from the Commonwealth of Pennsylvania the sum of $782,819.56, $68,437.55 at their branch at Harrisburg, and $2375 at their branch at Easton, on deposit, in the manner and upon the terms hereinbefore set forth. That is to say: the commonwealth has deposited notes of, and checks on various banks in the state of Pennsylvania, none of which have paid any of their liabilities in gold or silver, since the 5th day of February last; and one of which, (the Girard Bank), has recently become embarrassed, and suspended payment, and its notes have entirely ceased to be current. For the deposits thus made the commonwealth has received

[Commonwealth v. Bank of Pennsylvania.]

a general credit on the books of the respondents, and has the right of drawing for the amount thereof, checks or drafts for sums of money; but not checks or drafts payable in the particular notes or checks whereof the deposit was composed.

That these defendants supposed and believed that the said moneys would be required by the commonwealth to pay the interest to become due on the 1st of February 1842, and fully expected and were prepared to pay said money, whenever required to do so; but that owing to the failure of the Girard Bank, the refusal of the other banks in the city of Philadelphia to receive respondents' notes, the loss of public confidence, and the unexpected withdrawal of large sums of money by depositors and noteholders, on three successive days, immediately preceding the 31st day of January 1842, they could not have paid on the 1st of February 1842, the amount due said commonwealth, except in their own notes. That they have been, and still are, earnestly desirous to relieve the commonwealth from any inconvenience from their inability to pay their deposits in current funds.

That they have mixed the funds deposited by the commonwealth with the funds deposited by others, and with their own funds, in the usual course of business of this and all other banking institutions, so that they can no longer be distinguished.

That they never have threatened nor refused, nor intended to refuse, according to the allegation in the said bill, to pay over any sum or sums of money, to and for the trusts and uses, for which the same were received, but have been and are unable by reason of the causes hereinbefore set forth to pay the sums of money received from the commonwealth, at the present time, or until from a better state of the currency, they can collect their debts, and convert their estate and effects into money.

That they have property more than sufficient to pay any sum or sums of money they may owe to the commonwealth, or to others.

And these respondants further answering, say: that, to the best of their knowledge and belief, the said commonwealth is not in the slightest danger of losing any money due to them by the defendants, as will more fully appear from the exhibit hereunto annexed, marked (A), setting forth the estate and effects of the said defendants and their liabilities, and which they pray may be taken as part of their answer.

And these defendants deny that they have in any way misapplied the funds of the said Bank of Pennsylvania, or done, or authorized to be done, any act, matter, or thing, which they had not the right to do, in the management of the moneys, credits, and property of the Bank of Pennsylvania; without this, that there is any other matter, cause or thing in the said complainant's bill of complaint contained, material or necessary for these defendants to make answer unto, and not herein and hereby well and suffi-

ciently answered, confessed, traversed, avoided or denied, is true to the knowledge and belief of these defendants. All which matters and things these defendants are ready and willing to aver, maintain, and prove, as this honourable court shall direct. And the defendants humbly pray that your honourable court will dissolve the injunction granted in this case, and that they may be hence dismissed, with their reasonable costs and charges in this behalf most wrongfully sustained."

### Dr.        State of the Bank of Pennsylvania.

| | |
|---|---:|
| Bills discounted, | $1,952,769.25 |
| Bonds, Mortgages, and other Special securities, | 99,725.98 |
| Real Estate, | 306,734.90 |
| Loan to Chesapeake and Delaware Canal Company, | 12,360.00 |
| Stock of the State of Pennsylvania, | 370,542.00 |
| Other Stocks, | 83,744.00 |
| Post Notes received from the Bank of the United States, | 1,280,000.00 |
| Expenses, | 5,099.48 |
| Due by Baring, Brothers, & Co., | 1,095.65 |
| "       other Banks, | 205,026.40 |
| Notes of the Bank of the United States, | 155,000.00 |
| "        other Banks, | 306,829.57 |
| Specie, | 276,027.90 |
| | $5,064,955.13 |

### Cr.   .   Tuesday Evening, February 1st, 1842.

| | |
|---|---:|
| Capital Stock, | $2,500,000.00 |
| Contingent Fund, | 181,861.72 |
| Notes in Circulation, | 324,726.09 |
| Post Notes on time, | 303,750.00 |
| Profit and Loss, | 40,602.90 |
| Discount, | 13,202.83 |
| Exchange Account, | 315.19 |
| Unclaimed Dividends, | 9,622.20 |
| Interest payable on Stock of the Commonwealth of Pennsylvania, | 34,475.58 |
| Reimbursements on    "        "        " | 125.30 |
| Due to other Banks, | 390,394.19 |
| Due to Depositors, including $109,500, received from the Trustees of the United States Bank, on account of the Post Notes held by this Bank, and $853,632.11, to the credit of the Commonwealth of Pennsylvania, | 1,286,179.13 |
| | $5,064,955.13 |

Whilst these proceedings were pending, the Legislature, on the 29th of March 1842, passed an Act of Assembly, entitled

An Act to enable the Bank of Pennsylvania to make an assignment for the payment of its debts and for other purposes:

SECTION 1 Enacted that if the Stockholders of the Bank of Pennsylvania at an adjourned meeting or any general meeting called by the directors or holden in pursuance of their charter shall decide by a majority of the votes then and there present or represented according to the scale of votes allowed at elections of

directors that it is expedient for the said bank to make a general assignment of the real and personal estate of the said corporation to trustees for the payment or securing the payment of the debts of the same and shall moreover by a like vote elect three or more trustees for that purpose it shall be the duty of the directors of the said bank in the corporate name and under the corporate seal of the President Directors and Company of the Bank of Pennsylvania forthwith to make such an assignment and to do all such acts as shall be necessary to carry the same into full effect. *Provided* That in the election or nomination of trustees assignees and all other officers which may be elected to close the affairs of said bank or otherwise the state treasurer shall attend in person or by proxy on behalf of the commonwealth and have as many votes for the state on her stock as though the shares of the same were held by individuals as the law now limits in relation to the election of officers in said bank

Section 2 That the said assignment so made as aforesaid shall be deemed and taken to invest immediately in the trustees and their successors all the estate real and personal of the said corporation upon the trusts of the said assignment which trust shall be settled by the board of directors and approved of by the stockholders at a general meeting and that so much of any law of this commonwealth as requires securities from the trustees or assignees or any inventory or appraisement of the estate assigned be and the same is hereby dispensed with in the case of such an assignment and the board of directors shall be authorized to take such security as they shall deem proper in the case

Section 3 It shall be lawful for the said stockholders at such meeting and by such vote as aforesaid to give to the said trustees such powers over the assigned estate and effects as they may deem expedient not inconsistent with the said trust for the payment or securing the payment of the debts of the corporation in the manner aforesaid and also to impose such regulations upon them in regard to the manner of executing the trusts keeping and rendering accounts of the same and making dividends among the creditors and in regard to the responsibilities of the trustees and their compensation or allowance and also in regard to the expenses of the trust as they may deem right all of which powers regulations and provisions shall be introduced into said assignment. *Provided* That the said trustees or any trustees or assignees appointed in pursuance of the provisions of this Act for the payment or securing the payment of all or any portion of the debts of said bank shall receive in payment of debts due to the said bank or to them as trustees at par the notes or other evidences of debt issued or created by said bank and also the checks of depositors

Section 4 The trustees so elected shall hold their office until the 1st Monday in February next and until other trustees shall be elected in their stead and it shall be lawful for the said stockhold-

[Commonwealth v. Bank of Pennsylvania.]

ers on the said day by a like vote to choose the same or other persons to act as trustees as aforesaid for another year and until others shall be chosen in their place and so on from year to year so long as the said trust shall continue and is completely executed

Section 5 The said stockholders on the 1st Monday in February in each year shall be authorized in manner aforesaid to choose new trustees in the place of all or any of the existing trustees or to fill any vacancies And it shall be the duty of the trustees whose place shall be supplied in the trust together with any continuing in the same to execute such instrument as shall vest the trust estate and effects in all the trustees who are to act in the trust for the ensuing year

Section 6 The corporate powers of the said bank shall notwithstanding the said assignment be and continue in full force save and except that it shall not exercise the banking privileges of loaning money or issuing notes or bills until all the debts and liabilities of the bank called for shall be fully discharged or secured to the satisfaction of the creditors of said bank.  When the said trustees or the survivors or survivor of them shall reassign and set over all the trust estate and effects remaining in their hands to the President Directors and Company of the Bank of Pennsylvania. *Provided always* That so much of the sixth section of the Act entitled an Act to provide for the resumption of specie payments &c passed the 12th day of March 1842 as provides for a stay of execution upon judgments thereafter obtained in favour of certain banks therein referred to shall not be deemed or taken to apply to the said bank

Section 7 In case the said bank should make a voluntary assignment under this Act or any law now in force or by virtue of the order decree or judgment of any court in this commonwealth then and in that event the state treasurer shall appoint some suitable person in the said bank as " Commissioner of Loans" and all the powers and duties which by the tenth section of the Act of the 13th day of March 1830 entitled an Act to authorize a loan to defray the expenses of the Pennsylvania canal and railroad and to continue for a further time an Act to incorporate the subscribers to the Bank of Pennsylvania and for other purposes shall be vested in the person so appointed and be performed by him and all the stock that has been created by any law or that shall hereafter be created shall be issued and transferred by said Commissioner of Loans in as full and ample manner as they are now transferred by the said bank

Section 8 And the said Commissioner of Loans shall keep his office in the city of Philadelphia and of such commissioner and all the expenses of said office and the regular transfers shall be paid by the said bank quarterly in such sum as the state treasurer shall fix and the tenth section of the Act mentioned in the preceding section of this Act is hereby repealed.

SECTION 9 Before any assignment is or shall be made under any of the provisions of this Act by the Bank of Pennsylvania aforesaid said bank by an assignment duly executed shall deliver up and transfer to the state treasurer such bonds notes bills receivable or such other evidences of debt as shall appear a sum sufficient to pay the amount said bank is now indebted to the commonwealth for any money that has been deposited in said bank by the state treasurer.

On the construction of the first section of this Act, a contest arose which was determined by the opinion of this court, delivered on the 18th April 1842. (*Ante*, 177.) The defendants, on the 27th April 1842, moved to dissolve the injunction, which the plaintiffs opposed.

The case was argued by *Chester* and *Meredith*, in support of the motion; and
*Johnson*, attorney-general, *contra*.

The opinion of the Court was delivered by

SERGEANT, J.—The equity powers of our courts in respect to individuals, are circumscribed within a limited sphere, as we had occasion to point out in the case of *Gilder* v. *Merwin*, (6 *Wharton* 522); but over corporations their equity jurisdiction is general and unlimited: for by the 13th section of the Act of 16th June 1836, the Supreme Court and the several Courts of Common Pleas have the jurisdiction and powers of a Court of Chancery, as far as relates to the supervision and control of all corporations, other than those of a municipal character, and unincorporated societies or associations and partnerships. This gives the court all the powers and jurisdiction of a Court of Chancery over corporations, to be exercised in the ordinary mode in which a Court of Chancery acts, whether by bill, injunction or otherwise, as the equity of the case may require. If, in the present instance, the funds of the State were held by the defendants as their trustee, and the State has a priority of payment out of the assets of the bank, in preference to others, then an injunction to prevent the defendants from applying those assets, otherwise than in discharge in the first instance of the claim of the State, would be a proper proceeding until a hearing and decree upon the prayer of the bill. I agree, as was intimated in *Gilder* v. *Merwin*, that such a jurisdiction is, in many respects, ill adapted to a court organized as this court is, with an interval of six months in its sessions here, and that in some cases, extreme hardship and inconvenience may result from it: this, however, is not a consideration for us, but for the legislature, in whom only is vested the power to change it.

The grounds on which this motion has been argued, would make it necessary for us to decide, whether, under the Acts of Assembly, which have been referred to, the bank, in relation to the funds of the State, deposited with them, stood in the light of a

III. — 25                    R

trustee bound to give the State a preference over other creditors by deposit, or merely in the light of a debtor, the State being in the same situation as other creditors. Had this objection been taken by the defendants at the time of making their answer, and had a motion to dissolve the injunction then been made, the case would have come before us free from some of the circumstances that now attend it. The defendants did not, however, in the former stages of this proceeding, make any objection to the process, but on the contrary, if they did not expressly assent, acquiesced in it as a measure rather desirable for themselves under the circumstances then existing. Though the injunction was issued on the 31st January 1842, no answer was affirmed to till the 17th of February 1842; nor was any motion made to dissolve the injunction until the 27th day of April, 1842. In the meanwhile the defendants consented to make payments on account of the commonwealth under the rule of court of the 14th day of February 1842. And on the 29th of March 1842, the legislature passed an Act of Assembly which has an important bearing on the question before us. By that Act it would appear that a compromise or arrangement was made between the defendants and the commonwealth during the pendency of this injunction, for the adjustment of the claim of the commonwealth to the moneys deposited in the bank on account of the State, which was the cause of the injunction; and by the 9th section of this Act, a preference is expressly given to the commonwealth; and in return the commonwealth assents to an assignment by the bank. The terms and conditions of that assignment are stipulated, and privileges are conferred upon the bank. That Act has been carried into effect by a resolution of the stockholders to make an assignment according to the terms prescribed. It is true, the effort to go further and choose assignees has failed by reason of the imperfection of the language used in the proviso of the first section, as has been decided at the present term. But it by no means follows, that the whole Act falls to the ground as a dead letter; on the contrary, I perceive no reasons why the other provisions of the Act should not be considered as in force and operation until some further legislation takes place on the subject; since all that is now wanting is to supply the deficiency in the first section, the mode of choosing assignees, which may be done, and it is to be presumed will be done, by the legislature, at the earliest opportunity, under the influence of the same motives that dictated the former arrangement, and which we have no reason to suppose are in any respect changed; and thus the whole object in view can be attained.

The other parts of the law, excepting merely those in the proviso to the first section that relate to the choice of assignees, and such matters as follow their appointment, seem to be sufficiently precise and intelligible.

Without therefore pronouncing what may be the ultimate decree

of the court in the case on the prayer for relief, sufficient, we think, exists at present, to prevent the dissolution of the injunction.

KENNEDY, J. *dissenting.* — The bill filed on behalf of the commonwealth in this case, charged that the bank, being a corporation established under and by the authority of the laws of the said commonwealth, was made and constituted by said laws the depository of the public moneys of the said commonwealth. That in pursuance of the requisitions of the laws of the said commonwealth, large sums of the said public moneys had been deposited with the bank from time to time, amounting to $800,000 and upwards, which said sum was then in the custody, charge and keeping of the said bank, held and kept in trust, to be faithfully applied and paid over by the bank to such purposes and uses as the laws of the said commonwealth directed and prescribed. That the said laws directed and prescribed that the said sum of money, as aforesaid, should be on the first day of February, then next ensuing, paid over and applied to the liquidation and discharge of the semi-annual interest due by the said commonwealth on that day, to the respective holders of the certificates of loans made to said commonwealth, under authority of its laws. But so it was, that the President, Directors and Company of the said bank, in violation of the said trust confided to them, and intending to disregard the same, refused to comply with said requisitions of the laws of the said commonwealth, to pay and apply the said sum of $800,000 and upwards, moneys of the said commonwealth, as aforesaid, to the uses and purposes designated by law, for which said money was received. And that they threatened and intended to apply the said sum of money to their own use, in utter disregard of the obligations and duty created by law, and imposed upon them, as the depository of the public moneys, as aforesaid, unless they were restrained therefrom by the immediate injunction of the court. Further, that the defendants had misapplied and converted to their own use, large portions of the moneys so deposited with them, in trust and for the purposes above set forth; and that great loss and detriment would result to the said commonwealth, unless all the real and personal estate, and all the assets, of all sorts and kinds whatsoever, together with all books, notes, vouchers, and so forth, be secured under the order and direction of the court, in such manner, and in the hands of such agents or officers, as to the court might seem meet. And the bill then required that the defendants should be compelled, on their oaths, to the best and utmost of their knowledge, remembrance, information and belief, full, true, direct and perfect answers to make, to all and singular the matters aforesaid, as if they were distinctly interrogated thereto. And more especially, answer and state, First, whether they did not receive on deposit, the sum aforesaid, belonging to the said commonwealth, to and

for the trusts, uses and purposes aforesaid. Secondly, whether the said sum of money, or any part thereof, had been misapplied and converted to the uses of the said defendants; and if so, how much. Thirdly, whether they did not threaten and intend to refuse to pay over the said sum of money to and for the trusts and uses for which the same was received. And Fourthly, whether they were not wholly unable then and unwilling to pay to the said commonwealth, or to the purposes directed by law, the whole or any part of the said sum of money, deposited in the manner aforesaid, for the uses aforesaid; and whether the said commonwealth is not in great danger of losing the same. The bill further prayed, that a full and true account might be taken of every of the said trust moneys, the sum received on deposit by the defendants, the sum misapplied and converted to their own use; the property of all kinds whatsoever, real, personal and mixed, in possession of, and belonging to the said defendants, and that they should be decreed to pay the amount which seemed to be due to the said commonwealth on such account. And that, in the mean time, some proper persons might be appointed to take charge of such trust estate and effects, and all the estate and effects belonging to the said defendants. And that the defendants might be restrained, by the order and injunction of the court, from paying out any of their said trust moneys, or any other moneys, or from selling, assigning, transferring or delivering any of their real or personal estate, or effects of any sort whatsoever, to or for any purpose whatsoever.

The defendants, in their answer, state that they are a banking institution, duly incorporated and established by the laws of the Commonwealth of Pennsylvania, under the corporate name of "The President, Directors and Company of the Bank of Pennsylvania;" and that the chief place of business of said bank is in the city of Philadelphia. That various sums of money of said commonwealth have been from time to time remitted to, and deposited with said defendants; and that the sums of money so remitted to, and deposited with the said defendants, by the said commonwealth, amount to the sum of $782,819.56, the whole of which was received by said defendants, in notes and checks on other banks, and more than one half thereof in notes of, and checks on, the Girard Bank, in the city of Philadelphia. That they have endeavoured to dispose of as large a portion of their Girard Bank funds as was in their power, and that there is still due to them, the sum of $80,000 and upwards from the said bank. That they received the said moneys of the said commonwealth to the amount aforesaid, in the usual course of their business, in the same manner, upon the same terms, and under the same obligations, as they have received the moneys of all other depositors, during the whole time of their existence as a banking corporation, and upon no other terms, conditions or obligations whatsoever. That the

[Commonwealth v. Bank of Pennsylvania.]

usual course of the business of the said bank has been, at all times, to use the deposits made in said bank, in the discount of notes, the payment of checks, or for any other purpose which the necessities or convenience of the said bank might require, and to pay such deposits at all times on demand. That this mode of using the deposits made with said bank, was, or ought to have been, known and understood by the depositors, and particularly to the agents of the commonwealth who deposited the said public moneys with defendants, with the knowledge that said bank would use said funds, as some compensation for the trouble and expense of disbursing the same, in the payment of the interest due by the commonwealth to the holders of certificates of loans made to the commonwealth. That for this purpose they employed a clerk with a salary, purchased books, and incurred other expenses, for which they were to receive no remuneration or compensation from the commonwealth, except the privilege they enjoyed of using the said funds as aforesaid. And the defendants deny that they have, in violation of the trust confided to them, refused to comply with the laws of this commonwealth, or refused to pay any sum or sums of money due by the said defendants to the said commonwealth, or to any person or persons whomsoever, until they were enjoined from doing so by the court. That they have kept a general account with the Commonwealth of Pennsylvania, as with other depositors; and that they have never paid the interest due on the loans made to the commonwealth, or other debts or orders of the commonwealth, except when a draft has been regularly made on them for that purpose; and that no order or draft has been received by them for the balance due by them to the commonwealth.

And the defendants further say, that they have received from the Commonwealth of Pennsylvania, the sum of $782,819.56, and $68,437.55 at their branch at Harrisburg, and $2,375 at their branch at Easton, on deposit, in the manner and upon the terms hereinbefore set forth. That is to say; the commonwealth has deposited notes of, and checks on various banks in the State of Pennsylvania, none of which have paid any of their liabilities, in gold or silver, since the 5th day of February last; and one of which (the Girard Bank) has recently become embarrassed, and suspended payment, and its notes have entirely ceased to be current: for the deposits thus made, the commonwealth has received a general credit on the books of the respondents, and has the right of drawing for the amount thereof, checks or drafts for sums of money; but not checks or drafts payable in the particular notes or checks whereof the deposit was composed. That the defendants supposed and believed that the said moneys would be required by the commonwealth to pay the interest to become due on the 1st of February 1842, and fully expected and were prepared to pay said money whenever required to do so; but that owing to

[Commonwealth v. Bank of Pennsylvania.]

the failure of the Girard Bank, the refusal of the other banks in the city of Philadelphia to receive respondents' notes, the loss of public confidence, and the unexpected withdrawal of large sums of money by depositors and note-holders, on the three successive days, immediately preceding the 31st day of January 1842, they could not have paid on the 1st day of February 1842, the amount due said commonwealth, except in their own notes. That they have been and still are earnestly desirous to relieve the commonwealth from any inconvenience, arising from their inability to pay their deposits in current funds. That they have mixed the funds deposited by the commonwealth with the funds deposited by others, and with their own funds, in the usual course of business of this and all other banking institutions, so that they can no longer be distinguished. That they never have threatened nor refused, nor intended to refuse according to the allegation in the said bill, to pay over any sum or sums of money, to and for the trust and uses, for which the same were received, but have been and still are unable, by reason of the causes hereinbefore set forth, to pay the sums of money received from the commonwealth, at the present time, or until from a better state of the currency, they can collect their debts, and convert their estate and effects into money. That they have property, more than sufficient to pay any sum or sums of money they may owe to the commonwealth, or to others. And they further say, that to the best of their knowledge and belief, the commonwealth is not in the slightèst danger of losing any money due to them by the defendants, as will more fully appear from the exhibit hereunto annexed, marked (A.), setting forth the estate and effects of the said defendants and their liabilities, and which they pray may be taken as part of their answer. And they deny that they have in any way misapplied the funds of the said Bank of Pennsylvania, or done or authorized to be done, any act, matter or thing, which they had not the right to do, in the management of the moneys, credits and property of the Bank of Pennsylvania. The defendants, therefore, pray the court to dissolve the injunction granted in this case, and that they may be hence dismissed, &c.

Having thus stated the substance of the bill and answer, it may not be improper to mention also, the circumstances, under which the injunction, asked by the defendants to be dissolved, was granted by the court. The attorney-general for the commonwealth immediately upon his first reading and filing the bill, pressed the court to grant an injunction *instanter*, according to the prayer of the bill. The attorney or solicitor of the bank was in court at the same time, and was asked, perhaps, if he had any objection to make to its being granted. He said he was not authorized or instructed by the bank to appear in the case, and did not therefore feel himself at liberty either to give consent or make objection to its being done; though he knew that some of the directors of the

[Commonwealth v. Bank of Pennsylvania.]

bank, at least, if not all, were apprised, that an application for such injunction would be made at the time, on behalf of the commonwealth. The manner in which this was said, I have reason to believe, created an impression upon the minds of the Judges then composing the court, that there was probably no disposition on the part of the bank to oppose the court's granting an interlocutory injunction, to continue in force until such time as the defendants should have sent in and filed their answer to the bill. And certainly, for myself, I must say, that I was induced to believe, that such was the case, otherwise I should not have joined in granting the injunction, until more had been shown than was, on the subject; for I did entertain strong doubts, at the time, whether the case, as presented on the part of the commonwealth, was such as authorized the court to interpose and grant her prayer. But now, seeing that the answer of the defendants has been put in, and seeing it denies, not only every fact, but sets aside even every conclusion attempted to be drawn from the facts set forth in the bill, upon which it is claimed that the injunction ought to be sustained and continued in force, it is clear to my mind, that the injunction ought to be dissolved. Indeed, I feel satisfied, and think I shall show in the sequel, that it ought never to have been granted. If, however, the answer denies all the circumstances upon which the equity is founded, the *universal* practice, as to the purpose of dissolving or continuing the injunction, seems to be, to give credit to the answer; and this is carried so far that (unless in a few excepted cases,) even if five hundred affidavits were filed, not only by the plaintiff, but by as many witnesses, not one of them can be read to *prevent* dissolving the injunction. *Clapham* v. *White*, (8 *Vez.* 36, 37). See also *Isaac* v. *Humpage*, (1 *Vez. Jun.* 427; S. C. 3 *Brown's Ch. Ca.* 463); *Strathmore* v. *Bowes*, (2 *Dick.* 673; S. C. 2 *Bro. Ch. Ca.* 88; 1 *Cox* 263) ; and noticed also in note to *Gibbs* v. *Cole*, (3 *P. Wms.* 255). And the answer, in such case, has been held to maintain its ground, even where an indictment for perjury, upon the answer, has been found by the grand jury, and the injunction held not to be thereby revived, on the ground sufficient to warrant the court in making an order to revive it. *Clapham* v. *White*, (8 *Vez.* 35). The exceptions of this rule seem to be cases of waste, or on the infringement of patents ; *Gibbs* v. *Cole*, (3 *P. Wms.* 254), and some other cases, such as *fraud*. *Isaac* v. *Humpage*, (1 *Vez. Jun.* 427); or mischief analogous to waste. *Peacock* v. *Peacock*, (16 *Vez.* 49) ; *Norway* v. *Rowe*, (19 *Vez.* 144); *Charlton* v. *Poulter*, (*Ibid.* 148, *in note*). But Lord Eldon disapproved of the principle of these cases, and refused to let affidavits be read upon an injunction to restrain the negotiation of a bill of exchange. *Berkley* v. *Brymer*, (9 *Vez.* 356). See also *Hanson* v. *Gardiner*, (7 *Vez.* 311); *Smythe* v. *Smythe*, (1 *Swanst.* 254). In this last case Lord Eldon, even in a case upon a motion made, after an answer, for an injunction to stay waste, where no previ-

ous injunction had been obtained, refused to allow affidavits, filed after the answer, to be read in support of the motion.

It would, therefore, seem that, of late, the Court of Chancery in England has not been disposed to extend the ground of exception to the rule, which makes the answer, when it denies all the circumstances upon which the equity is founded, and the right to have the injunction continued is claimed, conclusive evidence in favour of its being dissolved. But in the case under consideration, all the circumstances, upon which the equity of the bill is founded, are most distinctly and unequivocally denied by the answer, which is not attempted to be controverted: nor have any affidavits been filed or offered to be read in evidence tending to disprove or impugn it in the slightest degree whatever. And, indeed, if any such were offered, it is clear that they could not be received, for this case does not come within the principle of any of the cases, in which the reading of affidavits of witnesses has been held admissible, for the purpose of disproving and destroying the implicit credit, which otherwise must be given to the answer, in the generality of cases. It is not a case of waste, or of mischief bearing any analogy thereto, or for the infringement of a patent. Neither does it appear from the answer, to be a case of fraud; nor is it now pretended on the part of the commonwealth to be such. But the *gravamen* of the complaint is, that the defendants received a large amount of moneys *in trust* for the commonwealth, as it is alleged, to be applied and appropriated by them, as set out in the bill, which they, in violation of the trust and their duty, refused to do and perform; and even threatened and intended, as it was believed, to appropriate the same to their own use. All this, however, is denied by the defendants, in their answer, in the most positive and express terms. Indeed it would appear, that the time for applying and paying the moneys mentioned in the bill, in the manner therein set forth, had not arrived at the time of filing it and granting the injunction thereon; nor had the defendants been required by the proper authority to pay the same or any part thereof, without which they were not bound to pay at any time, and could not, therefore, be said to be in default. So that according to the most strict and rigid rule of practice that can be found against the defendants, the injunction ought to be dissolved.

But the principal question in this case is, are the moneys mentioned in the bill, which were deposited with the defendants, being a banking institution at the time, to be regarded as deposited specially in trust for the commonwealth, or as moneys deposited generally, in like manner as is usually done by individuals? If any trust existed, such as to authorize this court to take cognizance of it, in the exercise of its equitable powers, it must be that the moneys or funds deposited with the defendants were merely deposited for safe-keeping, until wanted by the commonwealth,

and that they were not to be used by the defendants for banking purposes, or in any way, other than to be paid to the commonwealth or her order. If this could be shown to have been agreeable to the understanding of the parties, or to the construction, that the laws of the commonwealth, in relation thereto, have given to it, then it may be, that the defendants, agreeably to their own admission, contained in their answer, have violated their trust. But it is clear, that no arrangement or contract was ever entered into between the commonwealth and the bank, which could have produced such an understanding upon either side; in truth, nothing of the sort is alleged or pretended. And it is manifest, likewise, that it would not have been for the interest of the commonwealth to have made such agreement; for if she had, and the defendants had observed it faithfully, she must have lost, at least, $200,000, that is, one-half the amount of the notes of, and the checks on the Girard Bank, of which about one-half of the whole $800,000 deposited consisted, by converting them into such funds as would have been available to her in the payment of the interest of her debt; and indeed not only this, but most likely a still further loss, of very considerable amount, would have been sustained on the residue of the funds deposited, as no part thereof consisted of gold or silver, or of anything excepting the notes of, and checks upon other banks, none of which, it seems, redeemed or paid their notes or the checks drawn upon them at the time with specie. From the use, however, which the defendants made of the funds received on deposit from the commonwealth, they have been enabled to pay, and have actually paid, as has been admitted by her counsel on the argument, to her, since the injunction was granted, $600,000 of the $800,000 deposited; and according to the exhibit accompanying their answer, have ample means, it would seem, to pay the balance or residue in a short time, if their hands were not tied by the injunction, and they thus restrained from converting those means into money, so as to appropriate them to that end. Under this aspect of the case, the commonwealth, as it would appear, had but little, if any reason to complain, seeing she has been saved a loss, by the action and management of the bank, that, otherwise, would inevitably have fallen upon her. This special trust, however, is not what I understand the counsel of the commonwealth to contend for; he seems to think that the bank was bound, at all times, to pay, when called on, in such moneys or funds as would answer her purpose, whether the funds or moneys deposited by the commonwealth, with the bank, were used by the latter or not; and according to this notion, I presume, it was, that the commonwealth actually refused to receive that portion of the Girard funds deposited, which still remain in the possession of the defendants unconverted and unused. If such an obligation be consistent with the idea of a trust, the trust must be a very novel one, and such, certainly, as a court of equity has never taken cognizance of, be-

III. — 26

cause it is perfectly clear, that for a breach of such an obligation there is an adequate and complete remedy by action at law.

That such an obligation did and does exist on the part of the bank, I have no doubt, is correct; but then it arises from the act of the bank, in giving the commonwealth credit for the funds deposited, the same as if she had deposited the amount in gold or silver coin, and thus making the commonwealth a creditor and the bank her debtor; and likewise from a right which the bank acquired, not only by a tacit assent on the part of the commonwealth, but by the plain meaning and import of the Acts of Assembly, from which the bank has derived all its corporate rights and privileges, to use the moneys or funds deposited by the commonwealth, for banking purposes; such as paying the proceeds of notes and bills discounted, checks of depositors, and discharging notes drawn and issued by the bank, in the same manner that it is customary for banks generally to use the moneys deposited by individuals; so that the nature and extent of the obligation claimed, in this respect, by the attorney-general of the commonwealth, to exist in favour of the commonwealth, on the part of the bank, is precisely the same that exists in favour of every individual, who has made a deposit of his moneys in general terms with the bank. It is essentially such as constitutes the bank a debtor and the commonwealth or individual depositor a creditor thereof, and is wholly incompatible with the idea of the bank's being such a trustee for the commonwealth, in respect to the money or funds deposited by her, as will enable this court to interpose its equitable jurisdiction, so as to exercise a control over the bank, in its operations as such.    That no such trust exists between a bank and a note-holder thereof, who is considered a creditor, was determined in the case of *Catlin* v. *The Eagle Bank*, (6 *Conn. Rep.* 233), and upon ground, too, that has not been attempted to be controverted here.    But it has been said that a depositor stands upon a different footing from an ordinary creditor, such as a note-holder of a bank.    Though this has been said, it has not been made out clearly; and, indeed, I think, not at all; it certainly never has been held, or even supposed, in case of the bank becoming insolvent, that a depositor was entitled to a preference over a note-holder thereof in receiving payment out of the property or funds of the bank. But if a depositor is to be considered a *cestui que trust* of the bank, the consequence would seem to be, that he would not only be entitled to claim a preference in such case over a note-holder, but entitled to claim the funds of the bank from a note-holder, after he had received them in payment of his debt: for such a trust, I apprehend, cannot exist well in favour of a depositor, without his having a *lien* upon the property and funds of the bank, which would not only entitle him to a preference over a note-holder, but give him a right to follow and claim the same in the hands even of the note-holder, who had received such property or funds in

payment or satisfaction of the debt due to him on the note or notes, which he held against the bank. *Daniels* v. *Davidson*, (16 *Vez.* 249); *Catlin* v. *The Eagle Bank*, (6 *Conn. Rep.* 242).

Such a doctrine, however, would not only be repugnant to the universal practice of banks, and the understanding of mankind generally on the subject, but would go, in some degree, to set aside the common and ordinary transactions of the defendants, in their banking operations, and thus measurably defeat the very end for which they were incorporated. Then it would seem, if such a trust exists, as is contended for, in favour of the commonwealth, that the lien must be co-extensive with the trust, which would cover all the property of the bank, including all debts owing to it, seeing the commonwealth claims that the defendants shall dispose of no part thereof until that they first pay and satisfy the commonwealth out of the same; yet strange as it may seem, this latter the bank is restrained from doing, by the injunction obtained at the instance of the commonwealth, which the latter insists upon having continued in force, notwithstanding the defendants have manifested the strongest possible disposition to satisfy her, by having actually paid, under the leave of the court, $600,000 of the 800,000 deposited, since the injunction was issued, and again by the stockholders of the bank having passed a resolution, authorizing the defendants to give the commonwealth a preference over all its other creditors, including depositors, by making an assignment to the commonwealth of a sufficient portion of the property and effects of the bank, to satisfy the balance of the debt still coming to her. If property be in the hands of a trustee, for *certain specific* uses in trusts (either express or implied) and there is danger of its being diverted or squandered, to the injury of any claimant, having a present or future *fixed title* thereto, the administration will be duly secured by the court according to the original purpose, in such manner as the court may, in its discretion, under all the circumstances, deem best fitted to the end, as by the appointment of a receiver. 2 *Story's Equi.* 131, *pl.* 827. This may be done where rent or other income is to be received, *Id.* 130, *pl.* 826; or if the fund be of a pecuniary nature, the court may order it to be paid into court; and in some cases, when sufficient to answer the purpose, it will merely issue an injunction.—But it would be perfectly fanciful, if not absurd, to say that the property belonging to the bank in this case, consisting of real and personal estate, and the latter, in part, of debts owing to it, was holden in trust by the defendants for the *specific* use of the commonwealth. Hence it would not be a proper case for the appointment of a receiver. Indeed, it may be asked, who ever heard of a court of equity appointing a receiver or agent to take charge of and manage the concerns and business of a banking corporation, unless it were under the authority of an Act of the legislature, which is not pretended to exist here, passed for that purpose; with a view merely,

[Commonwealth v. Bank of Pennsylvania.]

not to carry on the business of banking, but to wind up and close the concerns of the institution? The defendants have no money that the court could order to be brought into court, for the commonwealth, it seems, has received all they had since the injunction was granted. And it is evident, that this case is not such as that a continuance of the injunction can afford any relief or remedy to the commonwealth; but on the contrary is rather calculated to prevent the defendants from converting her means into money for the purpose of paying the commonwealth, and the latter consequently from receiving her debt: and thus, as it were, to defeat the great object of the bill. Besides, it may be observed, that according to the strict rule of the common law, a corporation aggregate cannot hold in trust for the use of another; and one reason assigned in support of this rule is, that such a corporation cannot be compelled by subpœna from chancery, to execute the possession to the use, because if it disobeys, it cannot be compelled by imprisonment. *Gilb. Uses and Trusts,* 5. 170; *Jenk.* 195; *Plowd. Comm.* 102. 538. It must be admitted, however, that for charitable purposes corporations may be made trustees, and compelled to perform their trusts; but this, possibly, may be reconciled with the rule, upon the ground, that the trust is not considered as vested in the corporation, as a corporation; but the natural persons of whom it is composed are to be regarded as the trustees; and their description as constituent parts of a corporation, operates only as a more certain description of their persons; and this explanation agrees with what is said of a sole corporation, on the same subject, in *Gilb. Uses and Trusts.* See also, 2 *Leon* 122. " That a man who is a corporation sole cannot be seised to an use in his corporate capacity, nor by his corporate name alone without his *natural* name, and then the addition of his corporate name must be considered only as a fuller description of his person." 1 *Kyd on Corporations* 72, 73. It is possible, however, that a civil corporation aggregate may become a trustee, by special agreement, for other purposes than those of charitable, in certain cases; and unquestionably it may be so constituted by the Act of the legislature under which it is established, so as to give a court of equity jurisdiction over its acts as trustee. But then I apprehend, it cannot be made so by construction merely, on account of its having misapplied its funds. And accordingly Lord Eldon, in *The Attorney-General* v. *The Corporation of Carmarthen,* (*Coop. Ch. Ca.* 30), refused to grant an injunction to restrain the defendant from misapplying the funds belonging to it. And afterwards, in *The Mayor and Commonalty of Colchester* v. *Lawton,* (1 *Vez. & Bea.* 244, 245), upon a bill to set aside a mortgage of corporate property, as improperly made by the officer of the corporation, under the corporate seal, for purposes not corporate, the same learned and eminent Lord Chancellor remarks, that there was no instance to be found of a *trust* attaching upon the ground of mis-

application of the corporate funds, excepting in the case of corporations holding to charitable uses.

He also notices the opinion expressed by Mr Justice Ashhurst in the case of *The King* v. *Watson*, (2 *Term Rep*. 204), to the contrary, that if any corporation misapplied its moneys, it was such an abuse of its trust as would furnish ground for an application to a Court of Chancery, in such a way, as to show very clearly that he did not approve or concur in it.    Chancellor Kent, likewise, not less eminent for his knowledge of chancery principles, and the application of them, in the case of *The Attorney-General* v. *The Utica Insurance Company*, (2 *Johns. Chan. Rep*. 384–5), after referring to the opinion of Justice Ashhurst in *The King* v. *Watson*, which he seems to think was concurred in by the other members of the court, says, the chancery cases do not recognise any such general jurisdiction; and I think it may be fairly inferred from all that he does say on the point, that the inclination of his mind was with Lord Eldon.    Chief Justice Hosmer also, in delivering the opinion of the court, in *Catlin* v. *The Eagle Bank*, (6 *Conn. Rep*. 244–5), quotes with decided approbation, what has been advanced by Lord Eldon on this subject; and indeed it would appear, that the decision of the court in that case, against its equitable jurisdiction being exercised over the same, was based principally upon it.    This doctrine is also in accordance with the principles of the common law on the subject, which gives the power to corporations, as incidental to their being created such, to dispose of their property and funds freely, without being controlled therein by any court, in such manner as they may think will be most expedient and conducive to their interests.    *Siderfin Rep*. 162 ; *Smith* v. *Barret*, 10 *Co.* 29 *b*, 30 *a*, 30 *b*.    See also 3 *Com. Dig. Tit. Franchise, F*. 11. 18 ; 1 *Kyd on Cor*. 108.

Seeing then, that no agreement was ever entered into between the commonwealth and the bank, which would go to constitute the latter a trustee of the former for any special purpose, so as to create a lien in her favour upon the property or the funds of the bank, or to give her a preference in any way over other depositors or creditors of the bank ; and again that the practice and understanding of the bank uniformly, since it was first established, has been in direct opposition to everything of the kind ; I will now turn to the Acts of Assembly on the subject, and see what may be fairly collected from them in this respect.    The bank was first established under the provisions of an Act passed the 30th of March 1793.    It appears from the preamble to this Act, that it was thought the establishment of the bank would " promote the regular, permanent and successful operation of the finances of the state, and be productive of great benefit to trade and industry in general."    The capital stock was not to exceed $3,000,000, but was afterwards by an Act of the 13th of March 1830, extending the charter of the bank to the 4th of March 1858, reduced so as

not to exceed $2,500,000. This latter sum has been the amount of the capital stock of the bank for some years back, three-fifths of which is held by the state, and the remaining two-fifths by individuals or private corporations. By this latter Act the number of directors appointed for managing the affairs of the bank, was reduced from twenty-five to sixteen, four of whom are elected annually by the Senate and House of Representatives of the State, and twelve by the individual stockholders. By the prior Act, the bank was bound to lend large sums of money, at a rate of interest not exceeding six per cent. per annum, and by the latter Act to lend to an amount greatly exceeding the whole amount of its capital stock, at a premium of five and a half per cent., upon which an interest of five per cent. per annum was to be paid half-yearly, and the principal not to be reimbursed before the 4th of March 1858. Then, as an equivalent to the bank for these onerous duties and charges imposed upon it, the tenth section of the prior Act provided, that " the bills or notes of the bank originally made payable, or which shall have become payable on demand in gold or silver, shall be receivable in all payments to the state; and the public moneys of the state, as well as those of any corporation, thereafter constituted by the authority of the state, shall be constantly deposited in the Bank of Pennsylvania, whenever lying inactive." But by the first section of the latter Act " the place of deposit for the moneys of the commonwealth may be changed by the legislature, whenever they shall deem it the interest of the state to direct such change." The tenth section of the prior Act which I have recited in full, and the clause recited in the first section of the latter Act, is all that is contained in any Act relative to the deposits of moneys by the state in the bank. But it has been said that it was not intended by the legislature to confer a benefit upon the bank by making it the depository of the public moneys, but to make it chargeable with the trouble and expense of the safe-keeping thereof, without intending to allow it to use such moneys for its own purposes, as a bank, in any way whatever; and that the bank must be regarded as having assented to do so by way of yielding an equivalent for the privileges bestowed upon it by its incorporation. To give, however, such a construction to the Act in this particular, would not only be contrary to the plain import and meaning of the tenth section, and the whole tenor of both the Acts, but altogether unreasonable, seeing the state was to derive at least as great, if not greater benefits from the establishment and incorporation of the bank, than the private or individual stockholders; because she held afterwards the larger portion of the stock, and was to participate in all the profits made accordingly. Besides, it is but equitable, at least, that she should bear her due proportion of all the risk and expenses attending the operations and management of the affairs of the bank. According to the express terms, how-

[Commonwealth v. Bank of Pennsylvania.]

ever, of the tenth section, the legislature declare, that not only all moneys of the state when lying inactive, but likewise all moneys of corporations, thereafter constituted by the authority of the state, shall be deposited in like manner, in the bank. Now surely it cannot be pretended, that the state had any interest in, or could derive any advantage from making the bank keep safely, without using the same, the moneys of corporations thereafter created by her. And yet upon any construction that can be given to the section, if the bank be bound to receive the moneys of the one on deposit as a charge, without the possibility of benefit from it in any way, it is also bound, in like manner, to receive the moneys of the other; which would be subjecting the bank to a charge and expense that might prove injurious to the state as a stockholder, as well as the individual and private stockholders; which undoubtedly could never have been intended by the legislature.

It is, however, not only in exact accordance with the language of the 10th section of the prior Act, but reasonable and altogether consistent with the interest, as also the advantage of the state, as a stockholder, to consider that part of the section which declares that the public moneys shall be deposited in the bank, as an engagement on the part of the state, that it should be done for the common benefit of all the stockholders, including the State as such, so that the moneys deposited by the state, as also those deposited by corporations thereafter created, might be used, and profit made thereof, by discounting bills and notes, and paying the proceeds of the same out of the moneys so deposited, as was well known to be the practice and custom of banks at the time and before the passage of the Act. And this, in short, is the only rational construction that can be given to that clause or part of the section. Besides, in the 9th article of the 7th section of the prior Act it is declared, that the whole amount of debts contracted by the bank, shall at no time exceed the sum of three millions of dollars *over and above the moneys then actually deposited in the bank* for safe keeping, which goes to show clearly that the legislature intended that the bank, if it thought proper, should be at liberty to contract debts, upon the credit of its deposits generally, as well those deposited by the state as individuals; for no distinction is made, and that the amount of its debts was at all times to depend upon the actual amount of its deposits, so that if the deposits in the bank were large, it was to be at liberty to discount bills and notes to a greater amount than if the deposits were less. It seems to me that all these various provisions in the Acts incorporating the defendants, can receive but one interpretation; and that they all go to show most conclusively, that the money of the state, not wanted immediately by her, was to be deposited in the bank, in order to promote the interest of the bank, by its discounting and creating debts on the faith of its having a right to use it for that

[Commonwealth v. Bank of Pennsylvania.]

purpose; and more especially so, as the state would derive a benefit therefrom in common with the other stockholders. Besides, I would ask, if the provision for depositing the money of the state in the bank had been designed as an accommodation to the state merely, and not as an advantage to the bank, why should the legislature have reserved the right to themselves in the 1st section of the Act of 1830, renewing the charter to the bank, as already mentioned, of changing or taking away the deposits of the public money from the bank, whenever they should deem it the interest of the state to do so. This was entirely unnecessary, to say the least of it, if by making the bank the depository of the public money, it was intended thereby simply to impose an obligation on the bank to receive it for the exclusive accommodation of the state, without the privilege of using it in any way whatever for the benefit of the bank; because the state, under this view, could at any time have waived the exercise of such a right as she had secured and reserved exclusively for her own benefit. But if on the other hand, it was intended for the benefit of the bank, it was not only proper, but highly necessary for her to reserve the right of making the change, otherwise in doing so, she would have been justly chargeable with violating her agreement to the prejudice of the bank. This latter view of the matter, therefore, not only protects the legislature from the imputation of making idle and unnecessary provisions on the subject, but goes strongly to support the construction which I have given to the other parts of the Acts noticed above.

But it may be said, that on principles of public policy as well as those of expediency, the state is entitled to claim a preference over all other depositors or creditors of the bank, otherwise the embarrassment to which she might be subjected for want of money might be such as to affect the whole community, whose interest ought to be consulted at all times, in preference to those of individuals, and ought likewise to be sustained and promoted, though it should be detrimental to the latter. In doubtful cases, this argument might possibly have some weight, but certainly cannot be made to contravene the clear and manifest intention of the legislature; nor yet to enable the state to commit an act, which, if done by an individual, would be considered fraudulent, as being in violation of the confidence which he had induced. In order to show the true position of the state in this respect, it is requisite to bear in mind what has been already stated, that she holds, and for years past has held, three-fifths of the whole capital stock of the bank, and by her directors appointed by the legislature, in conjunction with directors appointed by the other stockholders, has ever had a share in the management and direction of the bank, in all its affairs and concerns. The legislature also of the state has every year been put in possession of the state and condition of the bank, by a report made thereof, by the board of directors or

[Commonwealth v. Bank of Pennsylvania.]

officers of the bank. Besides this, the legislature have the power of visiting the bank at pleasure, by a committee of its members, appointed for that purpose, who may inquire particularly into the state and condition of the bank, and for that purpose have a right to call for and inspect its books and papers, as well as to examine the officers thereof on the subject; which no other depositors or creditors of the bank have any right to claim. Hence the Bank of Pennsylvania has been considered by every one emphatically the state bank; and it not only received the peculiar patronage and support of the state, but likewise her confidence in the highest degree, from her having ever continued to make it the depository of her moneys. May it not then be supposed, that many men and private companies, knowing these circumstances and high credit in which the bank stood with the state, were induced on that account, to give credit to it either by depositing their moneys in it, or receiving its notes as cash, in place of gold or silver. Then suppose that, after this is done, it happens that the bank, through the want of sufficient foresight, or cautious management on the part of its directors, who are in part appointed by the state, becomes unable to meet promptly all its liabilities; when she being a large depositor as well as the private individuals and companies, who have given credit to the bank, mainly on account of the relation that existed between it and the state, and the confidence which the latter appeared to have in it, comes forward and claims to be paid first out of the funds of the bank, even to the entire exclusion of the other depositors and note-holders, if there should not be more than sufficient to satisfy the amount of her debt. What opinion would be likely to be entertained of the justice of such a claim?

If a wealthy company or partnership, consisting of individuals, having a like connection with a bank, treating it in like manner, and having a like influence to that of the state upon the public mind, were under the like circumstances, as the state has done in this case, to set up such a claim of preference, it appears to me it would be pronounced an attempt at fraud; and instead of being preferred, I am not certain but there would be some reason for saying that they ought rather to be postponed than preferred. But the state, perhaps, is entitled in such case to more favour or indulgence than individuals, as she can only act by means of her agents, who, in general, cannot be got to use the same degree of vigilance in regard to her money concerns, as well as other business that prudent individuals exercise in their own behalf in like matters. In no case, however, is the state entitled to claim a preference in being paid debts coming to her, unless an Act of Assembly can be found to authorize it. Certainly none has been produced in the present case; nor am I aware now of any case wherein such right is given. On the contrary, however, she is to be postponed, by an Act of the legislature, to all other creditors,

III. — 27          s *

[Commonwealth v. Bank of Pennsylvania.]

as against the estate of a debtor who has died insolvent; which rather goes to show, that it has never been deemed either just or necessary, by the legislature, to give the state a preference over other creditors of an insolvent debtor, whether he be living or dead. The state may acquire a preference by obtaining the first lien against the estate of her debtor, the same as an individual creditor may do. But this is effected only by compact with the debtor, or by a proceeding directed by law. It is also very clear, that an insolvent debtor of the state and of individuals, may either prefer the state to his other creditors, or postpone her to the last. In short, an insolvent debtor may prefer whomsoever of his creditors he pleases.

A corporation has the same right in this respect that an individual debtor possesses, unless restrained by its charter.

It has not, however, been shown in this case, nor can it be pretended, with any colour of truth, that the defendants have not the power of disposing of their property, and of preferring one creditor to another, if it be that they cannot satisfy all. So that, under every possible view that can be taken of the case, there is no ground whatever for continuing the injunction.

But an Act of Assembly, passed the 29th of March 1842, since the issuing of the injunction in this case, is said to have a bearing upon it, in favour of continuing the injunction. And, indeed, I understand it to be made the ground chiefly upon which a majority of the court has determined not to dissolve the injunction. The first section of the Act enacts, " that if the stockholders of the Bank of Pennsylvania, at an adjourned meeting, or any general meeting called by the directors, or holden in pursuance of their charter, shall decide by a majority of the votes, then and there present, or represented *according to the scale of votes allowed at election of directors*, that it is expedient for the said bank to make a general assignment of the real and personal estate of the said corporation to trustees, for the payment, or securing the payment of the debts of the same; and shall, moreover, by a *like vote*, elect three or more trustees for that purpose; it shall be the duty of the directors of the said bank, in the corporate name and under the corporate seal of the President, Directors and Company of the Bank of Pennsylvania, forthwith to make such an assignment, and to do all such acts as shall be necessary to carry the same into full effect. Provided, that in the election or nomination of trustees, assignees, and all other officers which may be elected to close the affairs of said bank or otherwise, the state treasurer shall attend in person or by proxy, on behalf of the commonwealth, and have as many votes for the state on her stock, as though the shares of the same were *held by individuals*, as the *law now limits in relation to the election of directors in said bank*." And by the 9th section, it is declared, " before any assignment is or shall be made under any of the provisions of this

Act, by the Bank of Pennsylvania aforesaid, said bank, by an assignment duly executed, shall deliver up and transfer to the state treasurer, such bonds, notes, bills receivable, or such other evidence of debt as shall appear a sum sufficient to pay the amount said bank is now indebted to the commonwealth, for any money that has been deposited in said bank by the state treasurer." These are, I believe, the only sections or parts of the Act which are supposed to relate to the question here. But they contain not the slightest allusion to this case, or the proceedings had in it; and I must confess that I am wholly unable to perceive how they, or any other portion of the Act, can be made to apply to or operate upon it.

As the Act was passed after the injunction was granted, it is impossible that the Act can be made the foundation of it in any way whatever: and seeing the Act has no reference to the injunction previously granted, and the pendency of it at the time, it is difficult, if not really impossible, to conceive how it can be affected by the Act. The great object of the Act was to enable the stockholders of the bank, if they should deem it expedient, to make, by the directors, a general assignment of the real and personal estate belonging to the bank, to such trustees as should be chosen by the stockholders on behalf of the bank, and the state treasurer on behalf of the state, for the purpose of making and securing the payments of the debts of the bank. Though the state, by the state treasurer, is to join in electing the trustees, it is left entirely to the discretion of the individual stockholders, without the vote of the state, to decide in the first place, whether it is expedient to make such general assignment. But if the stockholders decide in favour of the expediency of such an assignment, and then in conjunction with the state treasurer, elect trustees as directed by the Act, it is required by the ninth section as recited above, that the directors of the bank shall first, before they make such general assignment to the trustees appointed for that purpose, deliver up and transfer to the state treasurer, by an assignment duly executed, bonds, notes, bills receivable, or such other evidence of debt, as shall appear sufficient to pay the amount of the debt due to the state: it is therefore perfectly plain that this Act does not require or make it the duty of the defendants to give a preference to the state, unless the stockholders shall first resolve on the expediency of making a general assignment for the purpose of paying the debts of the bank. This it would seem they did, on the 1st of April 1842, at an adjourned meeting, in conformity to the powers granted them by the Act. But afterwards at a meeting of the stockholders and the state treasurer, held for the purpose of electing trustees, under the Act, the stockholders and he disagreed, as to the number of votes that he should give on behalf of the state, under the terms of the Act; he claimed to give one vote for each and every share of the capital stock

' [Commonwealth v. Bank of Pennsylvania.]

holden by the state, in the same manner as if each share thereof were held by a single person, without his holding more than one share, whereas the stockholders would only allow him to give thirty votes in all, on behalf of the state; that being the highest number of votes that an individual holding the same amount of stock as the state, would have been entitled to give, according to the scale of votes allowed at elections of directors of the bank. The stockholders proceeded in the election, but the state treasurer in consequence of the disagreement did not vote; thus leaving the stockholders to elect such trustees as they pleased: but upon a case stated for the opinion of this court, with a view to settle the question as to the number of votes that the state treasurer was entitled to give on behalf of the state, according to the terms of the Act, it was determined, that the Act in this particular was void for uncertainty; and that the election of the trustees, by the stockholders alone, was also void, because it was manifest from the terms of the Act that the legislature intended it should not be made without a vote given on behalf of the state. I would here observe, that although I cannot conceive how it is possible to make anything contained in this Act, a ground for continuing the injunction or refusing to dissolve it; yet it goes to show pretty clearly that the legislature were of the opinion, when they passed it, that the state had no right to claim a preference over other creditors of the bank, so as to have her debt paid first, otherwise they need not have introduced a stipulation to that effect into it, by declaring that before the bank should exercise the *power* thereby granted, of making a general assignment in favour of its creditors, it should first secure the payment of the debt owing to the state. But I must be permitted to observe further, that if there be anything in this Act, and the conduct of the bank under it, applicable to the question before us, it is decidedly in favour of the injunction being dissolved: for the bank instead of showing the least unwillingness to carry the provisions of the Act into complete execution, has on the contrary done everything in its power to effectuate the same. In my humble opinion, it was the fault of the state, that the arrangement contemplated by the Act, for giving to her a preference over other creditors, was not made with the bank; this she prevented by claiming to give as many votes, in the election of trustees, as she held shares of stock in the bank; and being the owner of three-fifths of the whole number of shares, it was in effect claiming that she should have the appointment of the trustees exclusively to herself, without permitting the individual stockholders to have any control whatever in her doing so: this however could not have been intended by the legislature; for it is not to be supposed, that so grave and intelligent a body, should have designed thus to mock the stockholders with the concession of a right to vote in the election of trustees, in such a way only as to render it altogether impossible that the

[Commonwealth v. Bank of Pennsylvania.]

exercise of it should avail them, under any imaginable state of things. I must also be permitted to say, though I do it with great diffidence, seeing this court, after argument, was unable to solve the question, on account of the seeming discrepancy or uncertainty in the language of the Act—that thirty votes, upon a fair construction of it, was all that the state treasurer was entitled to give on behalf of the state, in the election of the trustees.

This number the stockholders were willing to allow him to give, but no more; and in this it appears to me that they were right. It is true that there is some apparent discrepancy in the Act on this point, because, in the enacting part of the first section, the expediency of making a general assignment is to be determined by a majority of the votes of the stockholders, either present or represented at a meeting thereof, to be given according to the scale of votes allowed at elections of directors; and having decided in this manner in favour of the expediency of such assignment, the trustees were then to be elected by a *like vote;* that is, by a vote of the majority of the votes of the stockholders, given according to the same scale; but in the proviso, it is super-added, that in the election of trustees, the state treasurer shall attend, in person or by proxy, on behalf of the commonwealth, and have as many votes for the state on her stock, as though the shares of the same were *held by individuals,* as the law now directs in relation to the election of directors in said bank. If the proviso were so entirely repugnant to the enacting clause, as to be wholly irreconcilable with it by any reasonable interpretation, it being the last will of the legislature on the subject, might therefore be properly considered a repeal of the enacting clause, as was said in *The Attorney-General* v. *Chelsea Water Works Governors, (Fitz-Gibb.* 195). A proviso is generally introduced for the purpose of qualifying or explaining the enacting part, and never, I take it, in any case with a view of destroying or defeating the operation of it altogether. It is therefore the bounden duty of the court to give to the proviso such construction, if possible, as will not go to defeat the operation and effect entirely of the enacting clause. *Stevens* v. *Duckworth, (Hardw.* 344). If this, however, cannot be done, it may perhaps be right to consider the proviso as a repeal of the enacting clause, with which it cannot be reconciled by any possible construction, consistent with the main object of the Act, as collected from the whole tenor of the Act itself, and those Acts, if any, to which it has reference. But in no case, as it appears to me, ought the court to pronounce both the enacting clause and proviso void, on the ground of uncertainty as to the meaning, arising from inconsistency of the one with the other, or from the obscurity of the language employed therein; this would seem to be treating the Act of so intelligent a body as that of the Legislature, too much like the last will of an illiterate testator, made *in extremis, inops concilii;* and to

[Commonwealth v. Bank of Pennsylvania.]

carry with it an imputation that could not be well sustained. I am not aware of any case in which an Act of the legislature was ever before declared void, upon the same ground, by any court. When, however, an Act is passed under a belief, by the legislature, that a particular fact exists or event has taken place, which is not so, but the belief of its existence induces the passage of the Act, it may doubtless be declared void by the court, as was done in the case of *The Earl of Leicester* v. *Sir Christopher Heydon*, (*Plowd. Com.* 400). Because the legislature may be deceived or fall into an error, in regard to such a matter, as readily as an individual. But nothing of the sort occasioned the passage of the Act in this case. Then, as to the apparent discrepancy between the enacting clause and the proviso, it is plain that by the former the election of the trustees is given to the stockholders, excluding the state; for in using the term " stockholders" throughout the Act, it is perfectly manifest that the state is not meant to be included therein; and hence it would seem that one object, at least, of superadding the proviso was, to show that the legislature intended that the state should have a vote in the election of the trustees; and accordingly provided that " the state treasurer shall attend, in person or by proxy, on behalf of the commonwealth, and have as many votes for the state on her stock, as though the shares of the same were held by individuals," as the law then limited in relation to the election of directors in said bank. The state treasurer construed the words " held by individuals," as though they had been, by as many several *individuals*. But this is not the necessary and only import of them; and if they will bear any other, which will not go to defeat entirely the enacting clause, but to qualify and explain it, they ought to be so understood; *Foster's Case*, (11 *Co.* 63, *b*); because the construction of the state treasurer would give the election of the trustees to the state exclusively, so that the stockholders would have no part in it, the enacting clause to the contrary notwithstanding. Now, in order to render the words in the proviso explanatory of, and in some degree consistent with the enacting clause, so as to give a combined operation to both, they may be construed as if they were " by individuals jointly, or the *same* individuals jointly." And, strictly speaking, I am rather inclined to think that either of these forms of expression conveys the sense and meaning of the words in the proviso more distinctly and correctly than that contended for by the state treasurer; or if necessary, in order to render the enacting clause available to some extent, and to carry into effect what may be considered, if not absolutely the certain, yet the probable meaning of the legislature, the words " held by individuals" may be construed " held by an individual." It is every day's practice, in the construction of wills, rather than declare them void for uncertainty, to supply or alter words, as may seem requisite, for the purpose of giving effect to what may

[Commonwealth v. Bank of Pennsylvania.]

be fairly supposed to have been the probable intent of the testator. This has also been done in the construction of statutes. And although it may be done to support a will or a statute, in order to reconcile one part with another, and make the whole consistent, yet it cannot be done for the purpose of making one part defeat the entire operation of another, or to render the whole void for uncertainty, on account of apparent discrepancy. Then it is perfectly clear, and not disputed, as the law stood at the passage of the Act of March 1842, in regard to the number of votes that an individual or any number of individuals, holding jointly the same number of shares of stock that the state held in the bank, that thirty votes were all that could have been given by such individual or individuals. And why should the state be placed upon a more favourable footing, in this respect, than an individual or a number of individuals, holding jointly the same number of shares of stock that the state did? Certainly no disposition to favour the state in this respect has ever been evinced by the legislature in the passage of any previous Act. On the contrary, the very reverse has been the case. For under the Act of 1793, first establishing the bank, the state was only permitted to choose six directors out of twenty-five; and now, by the Act of the 30th of March 1830, four out of sixteen. This I also consider a powerful argument to show that the legislature could not have intended, by the Act of 1842, to give the state a greater number of votes at most, in the election of trustees, than an individual would have been entitled to, if her stock had been held by him. I have now only to observe, in conclusion, that as it has been decided by this court that trustees cannot be elected under the Act of 1842, no general assignment can be made, as thereby directed; and unless the bank can be allowed to make a general assignment to such trustees as the stockholders shall approve, and have a chance of electing, it is clearly under no obligation whatever to give a preference to the state. Nor can it be pretended, as it appears to me, that it is required by the Act, except in the event of the bank being enabled to make afterwards a general assignment to such trustees as the stockholders shall, or may, if united among themselves, select for that purpose.

HUSTON, J. also dissented.

Motion denied.